UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**PHILLIP DENNIS KEITH**,

Debtor.

Case No. **10-61722-7**

## *MEMORANDUM of DECISION*
## *FINDING DEBTOR PHILLIP DENNIS KEITH*
## *IN CONTEMPT OF COURT*

At Butte in said District this 21st day of December, 2010.

In this Chapter 7 bankruptcy, the United States Trustee filed on October 29, 2010, a Motion for Order Requiring Debtor to Show Cause Why He Should Not Be Held in Contempt. On November 16, 2010, the Court granted the United States Trustee's Motion by entering an Order to Show Cause, wherein Debtor was ordered to appear before this Court in Billings on December 20, 2010, and show cause why he should not be held in civil contempt and subject to sanctions for violating this Court's Order. Debtor did not appear at the December 20, 2010, hearing as directed. Neal G. Jensen of Great Falls, Montana appeared at the hearing on behalf of the United States Trustee. The Court heard statements from Neal Jensen, but no testimony was offered. This Memorandum of Decision sets forth the Court's finding of fact and conclusions of law.

BACKGROUND

Debtor filed this case under Chapter 11 of the Bankruptcy Code on July 16, 2010. Debtor

1

also caused to be filed five companion corporate cases: In *re Turn of the Century, Inc.,* Case No. 10-61662; *In re PS, Inc.*, Case No. 10-61663; *In re Jackpot on Main, Inc.*, Case No. 10-61664; *In re Bailey's Pub, Inc.*, Case No. 10-61884; and *In re Blackhawk, Inc.,* Case No. 10-61886.

Following a hearing held September 20, 2010, this Court entered a Memorandum of Decision and Order on September 29, 2010, converting Debtor's case to Chapter 7 of the Bankruptcy Code. The following facts formed the basis for this Court's decision to convert this case to Chapter 7:

> Debtor filed his voluntary Chapter 11 bankruptcy petition on July 16, 2010. Debtor's petition was not accompanied by Debtor's schedules or statement of financial affairs. Instead, upon Debtor's request, Debtor was granted an extension of time until August 6, 2010, to file his schedules and statement of financial affairs. Debtor tardily filed his schedules and statement of financial affairs on August 11, 2010.

> Even though Debtor's schedules and statement of financial affairs were not filed until August 11, 2010, they are dated July 16, 2010. Additionally, the schedules and statement of financial affairs filed August 11, 2010, bear Debtor's electronic signature, but Debtor testified that he did not actually sign his schedules and statement of financial affairs until his § 341(a) meeting of creditors held September 3, 2010.

> Debtor did not prepare his schedules or statement of financial affairs. Rather, Debtor's bookkeeper prepared Debtor's schedules and statement of financial affairs. Debtor admitted that he did not carefully review and confirm the accuracy of the information contained in his schedules and statement of financial affairs, but instead only reviewed them to "a degree."

> Debtor testified that his schedules do not list various parcels of real property, including property located on the "East Ridge" and property located on the Gainey Ranch in Scottsdale, Arizona. Debtor testified that he did not list such property in his schedules because he had either gifted such property, on intended to gift such property to his children. The Court notes that Debtor's purported gifts to his children are similarly not listed in Debtor's statement of financial affairs. Debtor also testified that he leases his main business office but the leasehold interest is not listed in Debtor's schedules.

While Debtor failed to list numerous parcels of real property in his schedules, Debtor's schedules do include real property valued by Debtor at $4,769,194.00. Debtor's Schedule A indicates that the $4,769,194.00 of real property is not encumbered by any debt or liens. Debtor admitted at the hearing that the listed real property is subject to liens, but explained that he thought he was only required to list "original" debt.

As for the listed real property, Debtor listed the value of Lots 18 and 19 as $505,000. At the hearing, Debtor testified that the property is actually worth approximately $1.8 million. Debtor explained that Schedule A reflects the value of the land only. Debtor did not include the value of the building or the business on the property.

Debtor's listing of personal property on Schedule B suffers from the same defects as Debtor's Schedule A. For instance, Debtor asserts on Schedule B that he owns no books, pictures, furniture, appliance, wearing apparel, etc. Debtor testified at the hearing that he owns such items of personal property. Debtor also conceded that the listed valuations of his various companies, such as Turn of the Century, Inc. and PS, Inc. are incorrect. Debtor testified that his valuations were based on "comps" of surrounding properties. Debtor also testified that he does not own 100% of PS, Inc., but instead only owns approximately 89% of the stock in such entity, even though Debtor's Schedule B states that Debtor owns 100% of PS, Inc.

Debtor next testified that he believes Willis and Walls owe him $240,000. In somewhat unintelligible testimony, Debtor also admitted that Turn of the Century, Inc. owes Debtor approximately $132,000 in past due rent and PS, Inc. owes Debtor approximately $814,400 in past due rent. The above amounts owed to Debtor are not reflected in Debtor's schedules. Debtor testified that he did not list the rent owed because he and his accountant were considering converting the amounts owed by Turn of the Century and PS to equity. Such suggestion was met by opposition from the creditors attending the hearing.

Debtor similarly did not list any contingent or unliquidated claims in his schedules. However, Debtor conceded at the hearing that he had contemplated filing adversary proceedings against Western Security Bank, Rocky Mountain Bank, Willis and Walls, Spelio and other entities on grounds such entities owe Debtor money.

Debtor also failed to list a 2005 Lexus and a 2005 Hummer in his schedules. The 2005 Hummer, which Debtor leaves in Arizona, is owned free and clear of any liens. Debtor explained that he did not list the Hummer in his schedules because he gave the 2005 Hummer to his son, even though the Hummer

is titled in Debtor's name.

Moving to Schedule C, Debtor claimed all his exemptions using the federal exemptions. Debtor also claims a homestead exemption of $505,000. Debtor admits that the property on which he claims the homestead property is commercial, not residential, property.

On Schedule D, Debtor asserts that he owes First Interstate Bank $51,850.00 on a judgment which is secured by gaming machines having a value of $50,000. Debtor first testified that he personally owns some gaming machines but then recanted, stating the gaming machines are actually owned by PS, Inc. Even though First Interstate Bank is listed on Debtor's Schedule D as a secured creditor, Debtor determined during the hearing that he is not personally indebted to First Interstate Bank on such obligation.

Debtor also testified that he signed a confession of judgment to Willis and Walls, but Debtor claims that such obligation is now disputed. Debtor lists an obligation of $683,600 owed to Willis and Walls on Schedule D, but Schedule D does not reflect that the obligation is contingent, unliquidated or disputed. Debtor lists Spelio as having a secured claim of $149,734 secured by unidentified property having a value of $67,000. Similarly, Debtor lists Western Security Bank as having a judgment lien of $970,981.00 secured by identified property having a value of $0.00. Contrary to Debtor's schedules, Debtor testified that Western Security Bank's judgment lien is secured by liquor licenses that have a value well in excess of $0.00.

On Schedule I, Debtor listed monthly income of $16,600 from Turn of the Century, Inc. Debtor, however, did not list his social security income or consulting income from Playatech.

Debtor does not list any mortgage payment on Schedule J, but Debtor testified that he makes a monthly mortgage payment in excess of $8,000 each month. Debtor explained that his accountant told him not to list the mortgage payment because the home is not in Debtor's name.

Debtor also did not list payments made to creditors just prior to his petition date. Debtor explained that he did not consider his mortgage payment, lease and car payments, utility payments and other such similar payments as "payments to creditors." Debtor once again explained that many of the items on which he was making payments had been gifted to his children. Debtor's schedules and statement of financial affairs do not disclose any gifts to his children and similarly, do not disclose that Debtor is holding property for others.

> Debtor also entered into a Commercial Buy-Sell Agreement dated June 4, 2010, to sell property located at 2300 King Avenue to Ronald M. Lund for $816,000. It is not clear whether Debtor has indeed sold such property, but neither the property nor the Buy-Sell Agreement are listed in Debtor's schedules or statement of financial affairs.
>
> Debtor conceded at the hearing that his schedules were incorrect and "sloppily done." Debtor testified that his schedules and statement of financial affairs have been corrected, but Debtor made no effort to file such schedules or at a minimum, present them as an exhibit at the hearing. Instead, the Court has before it Debtor's admittedly incorrect schedules and Debtor's testimony about allegedly corrected schedules.

Memorandum of Decision, September 29, 2010, docket entry no. 50 (footnote omitted). Debtor's five corporate companion cases were also eventually converted to Chapter 7 of the Bankruptcy Code.

After Debtor failed to file his amended schedules and statement of financial affairs and following a hearing held October 7, 2010, the Court entered an Order directing "that Debtor shall file his amended schedules and statement of financial affairs prior to **10:00 a.m. on Wednesday, October 20, 2010**, or be subject to sanctions under this Court's inherent authority." (Emphasis in the Court's October 7, 2010, Order found at docket entry no. 86) Moreover, after the September 20, 2010, hearing but prior to entry of the Order converting this case to Chapter 7 on September 29, 2010, the United States Trustee filed a "Motion to Compel Debtor and His Counsel to Turn Over Documents." In an Order entered October 12, 2010, the Court granted the United States Trustee's motion to compel, directing Debtor and his counsel to "immediately turn over to the United States Trustee any and all papers, documents, information and other materials which debtor provided to his counsel and his staff which were used in the preparation of Debtor's bankruptcy Schedules, Statement of Financial Affairs, Chapter 11 Statement of Current Monthly

5

Income, and other bankruptcy documents." *See* docket entry no. 91.

Debtor has not turned over any of the requested information. Debtor has similarly not filed his amended schedules and statement of financial affairs, even though they were allegedly prepared prior to the hearing on September 20, 2010. Debtor's failure to comply with the Court's October 7, 2010, and October 12, 2010, Orders forms the basis for the United States Trustee's October 29, 2010, Motion for Order Requiring Debtor to Show Cause Why He Should Not Be Held in Contempt.

Additionally, following conversion of this case to Chapter 7 of the Bankruptcy Code, Debtor's Chapter 7 § 341(a) meeting of creditors was scheduled for October 26, 2010. Debtor appeared at the October 26, 2010, § 341(a) meeting of creditors. However, the Chapter 7 Trustee could not conclude the October 26, 2010, § 341(a) meeting of creditors because Debtor had not filed his amended schedules and statement of financial affairs. The Trustee thus continued the § 341(a) meeting of creditors to November 30, 2010. The Trustee was forced to continue that meeting of creditors to December 10, 2010, after Debtor failed to appear at the November 30, 2010, meeting. Debtor also failed to appear at the continued December 10, 2010, meeting, forcing the Trustee to once again continue the meeting to January 2011.

As counsel for the United States Trustee explained, the Chapter 7 Trustees in this case and the five companion cases are struggling to effectively administer the bankruptcies because of the state of the schedules. Given Debtors failure to comply with the Court's order compelling turnover and because Debtor has failed to appear at the last two meeting of creditors, the Chapter 7 Trustee files a Notice of Debtor's Failure to Appear at § 341(a) Meeting of Creditors, which Notice includes a request that the Court order Debtor to appear and be examined at the continued

meeting of creditors.  The Court entered a second Order to Show Cause on December 20, 2010, directing that "Debtor **SHALL APPEAR** at a rescheduled § 341 meeting which shall be rescheduled by the Clerk of the Bankruptcy Court, or the Debtor may be subject to sanctions, including being held in contempt of Court, for failure to comply."  (Emphasis in the Court's December 20, 2010, Order to Show Cause, docket entry no. 190)

DISCUSSION

In discussing the inherent power of Article III courts to impose sanctions for bad-faith conduct that falls outside the scope of F.R.Civ.P. 11 and 28 U.S.C. § 1927, the United States Supreme Court, in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.C.t 2123, 2132, 115 L.Ed.2d 27 (1991), wrote:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."  *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing *Hudson*).  For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); *see also Ex parte Robinson*, 19 Wall. 505, 510, 22 L.Ed. 205 (1874).  These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631, 82 S.Ct. 1386, 1388-1389, 8 L.Ed.2d 734 (1962).

Following *Chambers*, the Ninth Circuit Court of Appeals has held that because Congress has not intentionally abrogated or restricted a bankruptcy court's inherent powers, a bankruptcy court has the inherent power to sanction through its status as a court of justice:

> Unlike Article III courts, which derive their powers directly from the Constitution, Article I courts' powers are derived wholly from statute.  *See, e.g., American Ins.*

7

>*Co. v. 356 Bales of Cotton (Canter)*, 26 U.S. (1 Pet.) 511, 545, 7 L.Ed. 242 (1828) (noting that territorial courts' power is conferred by Congress); *Palmore v. United States*, 411 U.S. 389, 397, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973) (discussing Congress' power to regulate jurisdiction of courts for the District of Columbia).
>
>There can be little doubt that bankruptcy courts have the inherent power to sanction vexatious conduct presented before the court. The inherent power is recognized in the statutory grant Congress has provided the bankruptcy courts:
>
>>(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.
>
>11 U.S.C. § 105(a). By providing that bankruptcy courts could issue orders necessary "to prevent an abuse of process," Congress impliedly recognized that bankruptcy courts have the inherent power to sanction that *Chambers* recognized exists within Article III courts. *See also In re Courtesy Inns, Ltd. (Jones v. Bank of Santa Fe)*, 40 F.3d 1084, 1089 (10th Cir.1994) ("We believe, and hold, that § 105 intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme Court in *Chambers*."); *In re Pace (Havelock v. Taxel)*, 159 B.R. 890, 904 (9th Cir. BAP 1993) (holding that § 105 grants bankruptcy courts the ability to sanction egregious conduct), *aff'd in relevant part*, 67 F.3d 187 (9th Cir.1995).

*In re Rainbow Magazine, Inc.*, 77 F.3d 278, 284 (9th Cir. 1996). *See Lindblade v. Knupfer (In re Dyer)*, 322 F.3d 1178, 1192 (9th Cir. 2003) (Civil penalties are designed to coerce compliance, as a civil sanction and not as a criminal (punitive) sanction wherein the violating party "has no subsequent opportunity to reduce or avoid the [sanction] through compliance."). *See also Matter of Terrebonne Fuel and Lube, Inc.*, 108 F.3d 609, 613, n.3 (5th Cir. 1997) ("Although we find that bankruptcy judge's can find a party in civil contempt, we must point out that bankruptcy courts lack the power to hold persons in criminal contempt.").

The purpose of civil contempt is "to coerce the defendant into compliance with the court's

order, and to compensate the complainant for losses sustained." *U.S. v. United Mine Workers of America*, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701-02, 91 L.Ed. 884 (1947). The purpose of a criminal sanction, on the other hand, is "to vindicate the authority of the court." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441, 31 S.C.t 492, 498, 55 L.Ed. 797 (1911).

Based upon Debtor's failure to comply with this Court's Orders entered October 7th and 12th, and Jensen's representations to the Court, the Court found at the hearing that the United States Trustee had satisfied its burden of proving by clear and convincing evidence that Debtor defied specific orders in contempt of this Court. Jensen stated at the hearing that the United States Trustee is not seeking compensatory damages at this time but rather, would like a sanction levied daily until Debtor complies with the Orders of this Court. Jensen also agreed that more drastic measures, such as incarceration, may eventually be necessary in this case. Because the United States Trustee is not seeking compensatory damages at this time, the Court will reserve on any ruling or request for daily monetary sanctions. The Court will similarly grant the United States Trustee time to schedule a Rule 2004 examination of Debtor. If Debtor fails to appear for the United States Trustee's Rule 2004 examination and produce all requested documents, the Court will consider incarceration as a mechanism to compel Debtor's compliance with the Orders of this Court pursuant to its inherent authority and F.R.B.P. 2005.

In accordance with the foregoing, the Court will enter a separate order providing as follows:

**IT IS ORDERED** that Debtor Phillip Dennis Keith is hereby found in Contempt of Court for his failure to comply with this Court's Orders of October 7, 2010, October 12, 2010, and November 16, 2010; and the Court reserves the right to impose compensatory damages, costs

and attorney's fees against Phillip Dennis Keith for his contempt of this Court; and the Court similarly reserves ruling on the United States Trustee's request for daily sanctions against Debtor.

> BY THE COURT
>
> /s/ Ralph B. Kirscher
> HON. RALPH B. KIRSCHER
> U.S. Bankruptcy Judge
> United States Bankruptcy Court
> District of Montana